UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

UNITED STATES OF AMERICA,

                   vs.

GILBERT ROSA SANCHEZ

-----------------------------------------------------------x

No. 16 Cr. 342 (GTS)


### DEFENDANT'S SENTENCING MEMORANDUM


Daniel DeMaria
Merchant Law Group LLP
535 Fifth Avenue, Fl. 25
New York, New York 10017

Tel.  212-658-1710
Fax. 212-658-1711

ddemaria@nyslitigators.com

## PRELIMINARY STATEMENT

Gilbert Rosa Sanchez is scheduled to be sentenced on August 29, 2017, following his conviction by guilty plea to participating in a conspiracy to distribute, and possess with the intent to distribute, cocaine. Mr. Rosa Sanchez promptly admitted his guilt and accepted responsibility for his actions without so much as filing a motion. Moreover, Mr. Rosa Sanchez has only been arrested twice in forty-four years and his last arrest was some 20 years ago. For the reasons set forth herein, it is respectfully requested that the Court sentence Mr. Rosa Sanchez to the lowest possible sentence. It is submitted that such a sentence would be reasonable and would be sufficient, but not greater than necessary, to satisfy the sentencing goals of 18 U.S.C. § 3553 (a). Regardless of the outcome at sentencing, Mr. Rosa Sanchez will be deported from the United States and separated from his family.

## ARREST AND PLEA

Mr. Rosa Sanchez has been in custody since his arrest on October 9, 2016. On March 23, 2017, Mr. Rosa Sanchez pled guilty to one count of conspiracy to distribute, and possess with the intent to distribute, cocaine.

## OBJECTIONS TO THE PSR

In addition to the objections which the Defendant previously made, and which are set out in detail in the addendum to the PSR, Mr. Rosa Sanchez makes the following objections and provides a response to the Government's ancipated objection to paragraph 21 of the PSR.

**Paragraph 8 of the PSR**

Mr. Rosa Sanchez states that there was no agreement that the red Mercedes (the same vehicle that would later be located in the garage at 328 Gilbert Street with 2.5 Kilograms cocaine in its trunk) would be registered in Samuel Rivera's name, and that Rosa Sanchez would pay for the vehicle and have use of it. On the contrary, Mr. Rosa Sanchez states the red Mercedes belonged to Samuel Rivera, that he did not drive it, and that he did not pay for it.

**Paragraph 16 and 18 of the PSR**

Mr. Rosa Sanchez states with respect to paragraphs 16 and 18, that he has not been able to find, in any of the discovery provided, the intercepted calls discussed below, and further states that Probation has not provided the date and time for these calls ("[a]ccording to case records and an interview of the case agent, intercepted calls between Rosa Sanchez and Gomez on October 5, 2016...") *See page 23 of the PSR.*

**Paragraph 24 of the PSR**

Mr. Rosa Sanchez objects to the application of the two-point enhancement for maintaining a premise for the purpose of distributing a controlled substance, pursuant to USSG §2D1.1(b)(12) (PSR ¶ 24). The premises in question is located at 328 Gilbert Street. Attached as **Exhibit "A"** are copies of various pictures provided in discovery which show others using the 328 Gilbert Street property.

For the two-level sentencing enhancement for maintaining a premises for the purpose of manufacturing or distributing a controlled substance to apply, the Government must prove by a preponderance of the evidence that the defendant (1) knowingly (2) opened or maintained any

place (3) for the purpose of manufacturing or distributing a controlled substance.   U.S.S.G. § 2D1.1(b)(12).

In this case, the property located at 328 Gilbert Street was owned by Samuel Rivera, not by Gilbert Rosa Sanchez. Jeffrey Rivera, Samuel's brother, resided at 328 Gilbert Street. As noted in the PSR:

> The DTO utilized several stash locations, including houses, apartments and garages, in and around the Utica area where cocaine was routinely stored, packaged and distributed to others. One of those locations was a detached garage located at 328 Gilbert Street in Utica. (The property, both house and garage were owned by Samuel Rivera.) Jeffrey Rivera lived in the house at that address and he used the Gilbert Street garage to meet with drug customers and distribute cocaine. Rosa Sanchez used that same garage to store cocaine and as a meeting location to accept deliveries of cocaine. ((PSR ¶ 8).

Similarly, paragraph 32 of the Application for a Search Warrant Affidavit, dated October 9, 2016, states that "A subpoena return for National Grid indicated that Jeffrey RIVERA was the account owner for utilities for Floor I and Floor 2 of 328 Gilbert Street." See attached **Exhibit "B"**.

The foregoing counsels persuasively against applying the two-level enhancement to Mr. Rosa Sanchez in circumstances where the Probation Officer reasons that the enhancement should apply because Mr. Rosa Sanchez "was observed by surveillance units opening the garage, turning lights on, opening the overheard door to allow the runners' vehicles to pull into the garage to unload deliveries of cocaine." (PSR p. 24). Probation further states, "Rosa Sanchez was the only defendant to use the garage in this manner." Id. Respectfully, Probation contradicts itself. As noted above, paragraph 8 of the PSR states that "Jeffrey Rivera lived in the house… and he used the Gilbert Street garage to meet with drug customers and distribute cocaine." Thus, how could Mr. Rosa Sanchez be the only one to "use the garage in this manner"?

This argument is supported by paragraph 23 of the Search Warrant Application, dated October 9, 2016, which states:

> At approximately 12:37 PM, an outgoing telephone conversation (call #7604) was intercepted on SUBJECT TELEPHONE #2 between Samuel RIVERA and Michael WROBEL on 315-794-2449. During that conversation, in sum and substance, Samuel RIVERA advised WROBEL to go to Gilbert Street where Jeffrey RIVERA lived. WROBEL advised Samuel RIVERA he would head right down to Gilbert Street and pay Samuel RIVERA tomorrow. At approximately 12:53 PM, a white Subaru with New York license plate HGC-6150 pulled into the rear driveway of 328 Gilbert Street, Utica, NY, which is located on Ontario Street, as witnessed by surveillance. A DMV records check indicated that the 2001 white Subaru was registered to Michael WROBEL of 15 Linwood Place, Whitesboro, NY. At approximately 1:08 PM, Jeffrey RIVERA arrived at the rear garage of 328 Gilbert Street, Utica, NY in a green Ford Explorer with New York license plate GNJ-3175, as witnessed by surveillance. Jeffrey RIVERA exited the driver side door of the green Ford Explorer and walked to the passenger window of WROBEL's Subaru, as witnessed by surveillance. Jeffrey RIVERA began talking with WROBEL with his hands inside of the vehicle, as witnessed by surveillance. At approximately 1: 11 PM, Jeffrey RIVERA returned to the Ford Explorer and left the rear driveway of 328 Gilbert Street, as witnessed by surveillance. Immediately after, WROBEL left the rear driveway of 328 Gilbert, and proceeded to drive westbound on Broad Street, as witnessed by surveillance. At approximately 1 :23 PM, a routine traffic stop was conducted on WROBEL by the Yorkville Police Department. During that traffic stop, a small amount of suspected cocaine was seized from WROBEL. WROBEL was not charged at that time and was allowed to leave following the traffic stop.

Paragraph 24 of that same application further supports Mr. Rosa Sanchez's argument stating:

> Your affiant has learned during this investigation that JEFFREY RIVERA instructs his customers to come to the rear driveway of his residence located at 328 Gilbert Street, Utica, where he then engages in narcotic transactions. JEFFREY RIVERA also continues to deliver cocaine to his customers at pre-arraigned locations. Based on the intercepted communications and surveillance, agents also believe that Osvaldo GARCIA assists JEFFREY RIVERA with processing and distributing cocaine and marijuana. For example, on August 17, 2016, surveillance observed Jeffrey RIVERA and Osvaldo GARCIA carrying black bags and a marijuana plant in an orange bucket from the rear garage of 328 Gilbert Street which they then placed into a green Ford Explorer.

Similarly the DEA reports describe a meeting where SA Phelan "obtained a license photograph of WROBEL and confirmed the white male that met with RIVERA in the rear driveway of 328 Gilbert Street was Wrobel." *See attached **Exhibit "C"**.*

4

Mr. Rosa Sanchez will not postulate on whether the two-level enhancement should apply to Jeffery Rivera and/or Samuel Rivera, but it certainly should not apply to him. His position is supported by the case law, as well as the fact that his girlfriend's White Jeep Wrangler was stored at 328 Gilbert Street, such that Mr. Rosa Sanchez had lawful reasons to be there.

In the result, even though Mr. Rosa Sanchez may have used 328 Gilbert Street for drug related activities, it cannot be said that Mr. Rosa Sanchez opened or maintained the property located at 328 Gilbert Street (or the garage) for the purpose of manufacturing or distributing a controlled substance. There is nothing in the discovery demonstrating that Mr. Rosa Sanchez ever met customers at the 328 Gilbert Street garage.

In United States v. Carter, 834 F.3d 259 (3d. Cir. 1996), the Court upheld a two-point enhancement in circumstances where a drug defendant's home played a significant part in distributing drugs because the defendant had no job other than cooking crack cocaine and selling it, he cooked cocaine in the kitchen of his house, his house contained tools of the drug trade, including digital scale, drug-packaging materials, and police scanners, the house contained almost $4,000 in cash at a time when defendant had no other employment, and guns and drugs were found. See also United States v. Bell, 766 F.3d 634 (6th Cir. 2014).

In United States v. Flores-Olague, 717 F.3d 526, 531 (7th Cir. 2013), the explained that the key factors that determined the principal use was the "importance of the sales" and "customer interactions" at the residence. Id. at 533. Specifically, the sentencing inquiry must include consideration of a variety of other factors germane to the scope of illicit activities as indicia that drug trafficking was the principal use of the premises - quantities dealt, customer interactions, storage of "tools of the trade," maintenance of business records, the use of a child to deliver

5

narcotics, and acceptance of payment. Id. In contrast to the instant case, the facts in Flores-Olague showed drug trafficking was an everyday occurrence. Further, the Court in Flores-Olague relied on the seizure at the premises of $53,620, four firearms, five cellular phones to justify the enhancement. Finally, the court in Flores-Olague found his abusive and authoritarian treatment of the home's co-residents evidence that he "maintained" the premises "[w]here the evidence showed that over a period of time the he could direct the activities of and the people in a place" Id. at 5

In sum, the more characteristics of a business that are present" in the home - such as "tools of the trade (e.g., laboratory equipment, scales, guns and ammunition to protect the inventory and profits)," "profits," including large quantities of cash, and "multiple employees or customers" - the more likely it is that the primary use of the property is for prohibited drug trafficking. See United States v. Johnson, 737 F.3d 444, 447 (6th Cir. 2013).

Applying the foregoing to Mr. Rosa Sanchez's case, it is clear that a two-point enhancement is not warranted. The house (and the garage) were not owned by Mr. Rosa Sanchez, nor did he reside there. There was no evidence of payment being accepted or made at 328 Gilbert Street, there were no business records found, there were no firearms found, there was no evidence that Mr. Rosa Sanchez made use of the "multiple digital scales" or the "electric grinder" which were found. Moreover, no large quantities of cash were recovered, nor were there multiple employees or customers working at 328 Gilbert Street. Moreover, and as noted above, the resident of the home located at 328 Gilbert Street, Jeffery Rivera, "used the Gilbert Street garage to meet with drug customers and distribute cocaine." PSR ¶ 8.

In short, the two-point enhancement does not apply to Mr. Rosa Sanchez in circumstances where he neither owned, nor lived at 328 Gilbert Street, in circumstances where those who did

6

used the garage to meet drug customers and distribute cocaine, and in circumstances where the garage lacked "tools of the trade (e.g., laboratory equipment, guns and ammunition to protect the inventory and profits)," "profits," including large quantities of cash, and "multiple employees or customers."

Regarding the §2D1.1(b)(12) "maintains" requirement for garage, it must be again noted that Mr. Rosa Sanchez did not own or reside at 328 Gilbert Street, nor that he was either abusive or authoritarian in the treatment of the property's residents, nor that he denied their ability to access the garage, nor that he exercised a leadership function. In sum, Rosa Sanchez did not direct the activities of the people at 328 Gilbert Street, he gave no instructions to what should be done regarding the storage of drugs, he did not bring customers inside the garage to purchase drugs, and he clearly did not hire and house employees for the purpose of manufacturing or distributing drugs.

In conclusion, a two-offense level enhancement pursuant to USSG § 2d1.1. (b)(12) is unwarranted because Rosa Sanchez did not maintain a premises for the purpose of manufacturing or distributing a controlled substance. This outcome for Rosa Sanchez is supported by the words of USSG § 2d1.1. (b)(12), the USSG application notes for that section and the case law interpreting that section.

**Page 21 of the PSR**

In response to the Government's objections to the guideline computation, arguing that an aggravating role adjustment, pursuant to USSG §3B1.1, is applicable in this case, the Defendant responds as follows. First, it must be noted from the outset that *even if* Rosa Sanchez exercised management responsibility over the activities of the DTO (e.g. arranging for and accepting drug deliveries), he was not an organizer, leader, manager, or supervisor of *another participant*; and

therefore, an aggravating role adjustment is not applicable. A litany of cases support Mr. Rosa Sanchez's position, as well as the Probation Officer's position. Based on the cases discussed below, the following factors are useful to see why Mr. Rosa Sanchez is not an organizer and why the four level enhancement does not apply. Those factors are whether Mr. Rosa Sanchez:

a.  Collected money or profits for the group;

b.  Paid bills or otherwise fronted money for the drug operation;

c.  Determined when the transport of drugs would occur or time or location of any sales;

d.  The price of drugs or determined the amount of money each participant would receive;

e.  Whether you recruited or enlisted the help of others;

f.  Whether you used your "expertise" to train others in the conspiracy;

g.  Whether you claimed a right to a larger share of the profits;

h.  Your age as compared to the age of the others in the conspiracy.

In United States v. Sayles, 296 F.3d 219 (4th Cir. 2002), the Court found that while the defendants bought and sold significant amounts of "crack," the federal district court clearly erred in imposing a U.S.S.G. § 3B1.1(a) four-level increase in the offense level for one defendant's aggravating role as an "organizer or leader" in the drug conspiracy, and a two-level increase for second defendant's lesser aggravating role, as there was no evidence that either defendant functioned as any sort of "organizer, leader, manager or supervisor," exercised decision-making authority, planned and organized the drug trafficking, exercised control and authority over others, recruited drug couriers, or claimed a larger share of the fruits of the conspiracy. In that case, the Defendants were convicted of various drug offenses, and one was also convicted of a related firearm violation. On appeal the court vacated in part, remarking that the federal district court

8

clearly erred in imposing role in the offense increases in the defendants' offense levels. To qualify for a four-level increase under U.S.S.G. § 3B1.1(a), the court related that a defendant must have been "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." Neither of the defendants, the court indicated, argued that the charged conspiracy involved fewer than five participants, but, rather, each of them raised a single contention: the Government did not produce evidence that he functioned as any sort of "organizer, leader, manager or supervisor" in the conspiracy. The Sentencing Commission has indicated that a court should consider seven factors in determining a defendant's "leadership and organizational role," the court instructed, including the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. The court noted that, with respect to the defendant who had been assessed a four-level enhancement, the presentence investigation report recommended that because the conspiracy involved five or more participants and because the defendant had at least three sources of supply for "crack" cocaine, and, because one person stated that he sold "crack" for the defendant on approximately 20 occasions, the defendant was "by definition a leader in criminal activity involving five or more participants," thus justifying the sentencing enhancement. However, the court indicated, while the government produced ample evidence that the defendants bought and sold significant amounts of cocaine, the government offered no evidence that either defendant recruited drug couriers or that the defendant claimed a larger share of the fruits of the conspiracy.

Similarly, in United States v. Lewis, 476 F.3d 369 (5th Cir. 2007), the court of appeals reversed the four-level sentencing enhancement applied to one defendant under U.S.S.G. §

3B1.1(a) because of insufficient evidence that he acted as a leader or organizer of the drug conspiracy. Although the defendant held a leadership position in the Aryan Circle organization that was involved in the drug conspiracy, the defendant did not exercise control or authority over other participants in the drug operation. The court also determined that there was no evidence that the defendant recruited accomplices or claimed a share of methamphetamine produced and sold by other members of the Aryan Circle. Thus, the court reversed the enhancement of the defendant's sentence for a leadership role in the conspiracy on the basis of insufficient evidence.

In <u>United States v. Jones</u>, 160 F.3d 473 (8th Cir. 1998), the Court held that a four-level enhancement could not be imposed on the defendant for serving as a leader or organizer of a conspiracy when nothing in the record indicated that the defendant did anything other than provide drugs to the conspiracy, and did not exercise decision-making authority, recruit accomplices, claim a right to a larger share of the fruits of the conspiracy, participate in planning or organization, or have control or authority over others. The court, in so ruling, commented that nothing in the record indicated that the defendant did anything other than perhaps provide drugs to a central figure in the criminal conspiracy, and, while the defendant provided significant amounts of drugs to the conspiracy, his status as a supplier or distributor was already reflected in his base offense level. The court determined that the defendant was not the "organizer" or "leader" of a conspiracy, for, while he sold large enough quantities of cocaine that it was reasonable to infer that he knew the drugs were being resold, he did not have any involvement in the resales. There was no evidence, the court declared, that the defendant controlled his buyers in their resale of the cocaine. As the defendant's role in the charged offense did not satisfy any of the factors enumerated in the commentary to the Sentencing Guidelines, the district court committed clear error by imposing a four-level enhancement under U.S.S.G. § 3B1.1(a), the court concluded.

In <u>United States v. Miller</u>, 91 F.3d 1160, 45 Fed. R. Evid. Serv. 386 (8th Cir. 1996), the court of appeals, affirmed the convictions but vacated the sentence and remanded, holding that a four-level enhancement for being an organizer or leader of a criminal activity (U.S.S.G. § 3B1.1(a)) was improperly imposed upon the defendant, who did not have any involvement in the resale of the drugs. Typically, the court noted at the outset, the sentencing enhancement of U.S.S.G. § 3B1.1(a) applies to a defendant who employs or otherwise arranges for intermediaries to sell his drugs. However, the court remarked, the courts have broadly interpreted the terms "organizer" and "leader," such that the defendant need not "directly control" his or her intermediaries. The court stressed, though, that if the words "organizer" and "leader" are to have their ordinary meaning, a defendant must do more than sell for resale. The court added that it had always required evidence that the defendant directed or procured the aid of underlings. In the instant case, the court stated, the defendant was not the "organizer" or "leader" of a conspiracy, for, while he sold large enough quantities of methamphetamine that it was reasonable to infer that he knew the drugs were being resold, the defendant did not have any involvement in the resales. Further, the court stated, there was no evidence that the defendant controlled his buyers in their resale of the methamphetamine. While the government contended that the four-level enhancement should nonetheless apply because the defendant supplied the drugs that his coconspirators later resold, it has been held, the court instructed, that controlling property does not make one an "organizer" or a "leader." Applying a plain meaning approach to "leader" and "organizer," the court noted that their definitions related to supervision of people only. "Leader" is defined as a person who leads as a commander, the court commented, and "organizer" is defined as a person who travels for the purpose of establishing new organizations. A commander commands people, and organizations are composed of people, the court continued, and, unlike a manager, a leader's or organizer's actions must directly affect other

11

people. Consequently, the court concluded, a leader or organizer must control or influence other people.

The court in United States v. Owens, 70 F.3d 1118 (10th Cir. 1995), held the defendant was not a leader or organizer, despite the fact that he supplied cocaine on credit to his nephews, who redistributed the cocaine to other retail dealers for resale in a particular area of Oklahoma City, the court reasoning that he and his nephews split the proceeds of the enterprise equally, that the defendant did not restrict the people to whom his nephews could sell drugs or whom they could hire to distribute the drugs to their retail customers, and that the defendant did not control the place of wholesale or retail delivery, or set retail prices. To determine whether a defendant was an organizer or leader pursuant to U.S.S.G. § 3B1.1(a), the court noted, the district court should consider, among other things, the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. The court stressed, that the gravamen of an "organizer" or "leader" sentencing enhancement is control, organization, and responsibility for the actions of other individuals, and is not merely for "important" or "essential" figures in the enterprise. The record did not contain evidence tending to show any of the recognized indicia of leadership and control, the court related, and, for example, there was no evidence that the defendant restricted the people to whom his nephews could sell drugs or whom they could hire to distribute drugs to their retail customers.

In United States v. Carter, 449 F.3d 1287 (D.C. Cir. 2006), the court of appeals held that the district court's findings, in a case where defendant received a life sentence for possession with

12

intent to distribute heroin and conspiracy to distribute and possess with intent to distribute heroin and cocaine, did not support a four-level enhancement under U.S.S.G. § 3B1.1(a) because the district court only found that defendant was a "point of contact" for heroin for several people and had several people delegated to him, not that he exercised authority over others. The court explained that one who occupies an "organizer" or "leader" position under U.S.S.G. § 3B1.1(a) plays a role distinct from that of a mere "hub" or "orchestrator" of the conspiracy. Therefore, the court remanded the case for a finding by the district court on defendant's degree of control or authority over his associates, or in the absence of such finding for defendant's resentencing.

Applying these cases to the instant case, even if Rosa Sanchez exercised management responsibility over the activities of the DTO (e.g. arranging for and accepting drug deliveries), he was not an organizer, leader, manager, or supervisor of another participant. There is nothing in the record to suggest that Mr. Rosa Sanchez claimed the right to a larger share of the fruits of the crime; that he restricted the people to whom his co-conspirators could sell drugs to; that he controlled the place of delivery to customers; that he set retail prices or had any involvement in the resale of drugs; or that he had any control of authority over any participant. As a result, the Court should follow probation's recommendation and should not apply an aggravating role enhancement.

## SENTENCING LAW

18 U.S.C. § 3553(a) directs sentencing courts to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) thereof. Said purposes are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In determining the minimally sufficient sentence, 18 U.S.C. § 3553(a) further directs sentencing courts to consider the nature and circumstances of the offense, the history and characteristics of the defendant and the need to provide restitution to any victims of the offense. Since <u>United States v. Booker</u>, 543 U.S. 220, 125 S.Ct. 738 (2005), sentencing courts must consider all of these factors along with the now-advisory sentencing guidelines and the Court is entitled, after all relevant considerations, to grant a variance and to impose a non-guidelines sentence. <u>United States v. Crosby</u>, 397 F.3d 103, 111 (2d Cir. 2005).

## <u>CONSIDERATIONS UNDER 18 U.S.C. § 3553(a)</u>

As the Second Circuit noted in <u>Crosby</u>, without a mandatory duty to apply the guidelines, the other section 3553(a) factors have "acquired renewed significance." <u>Crosby</u>, 397 F.3d at 111, see also, <u>United States v. Lake</u>, 419 F.3d 111, 114 (2d Cir. 2005).

Under 18 U.S.C. § 3661, "no limitation shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." This statutory language overrides the advisory policy statements in Part H of the sentencing guidelines, which list as "not ordinarily relevant" to sentencing a variety of factors such as the defendant's age, educational and vocational skills, mental and emotional conditions, drug or alcohol dependence, and lack of

14

guidance as a youth. See U.S.S.G. § 5H1. These factors are precisely "the sort of characteristics a court is likely to find relevant when determining the 'history and characteristics of the defendant' as required by § 3553(a)(1)." United States v. Simon , 361 F.Supp.2d 35, 40 (EDNY 2005).

1. **History and Characteristics of the Defendant**

Mr. Rosa Sanchez is 43 years old. He was born in the Dominican Republic and came to the United States in 1993 at the age of 20. Mr. Rosa Sanchez comes from a close-knit family and has a very loving girlfriend. He has five children. He is proficient in Spanish, English, and Dutch.

Mr. Rosa Sanchez has a GED. He also has a history of steady employment. From 2014 until October 2016 he worked as a cook and delivery driver at a local restaurant. From 2012 to 2014 he worked as a mechanic. Prior thereto, from 2003 to 2007, he worked as a laborer. Mr. Rosa Sanchez's work history demonstrates that he is not a stranger to hard work and that he has the ability to be a productive and law-abiding member of society following his release from prison and his deportation.

Submitted herewith are letters from Mr. Rosa Sanchez's family and friends. Reading these letters it becomes obvious very quickly that Mr. Rosa Sanchez is surrounded by a group of caring, loving and law-abiding family and friends. Mr. Rosa Sanchez is a pleasure to be with, thoughtful, caring and helpful to those around him. Unfortunately, Mr. Rosa Sanchez has made very poor and unfortunate choices which led to arrest in this case. Mr. Rosa Sanchez takes full responsibility for his actions and is determined to leave his illicit activities behind and to become a respected and hard-working member of society. The letters attached hereto suggest that Mr. Rosa Sanchez's conduct in this case is not likely to be repeated.

### 2.   Nature and Circumstances of the Offense

Mr. Rosa Sanchez blames no one but himself and will forever regret the poor decisions which he made and which led to his arrest in this case and to his inevitable deportation. Of note, is the fact that this offense did not involve firearms or violence. Nor did the offense involve far more destructive drugs like heroin, fentanyl or crack cocaine.

### 3.   Punishment, Deterrence, Protection of the Public and Rehabilitation

A lengthy sentence for Mr. Rosa Sanchez would be needlessly and overly punitive, and would not appropriately serve the goals of sentencing. Moreover, his being incarcerated any longer than that would not only affect him, but also his wife, his children and other family members whose lives he has touched and who depend on Mr. Rosa Sanchez. It would also be counterproductive, both for Mr. Rosa Sanchez and for society, as a lengthier sentence would make it far more difficult for him to readjust to the real world upon his release. This is doubly true in circumstances where Mr. Rosa Sanchez will be deported.

Beginning the middle part of the last century, an enthusiasm for harsher punishment and longer periods of incarceration began to pervade the public discourse. The policy choices that resulted have created an unparalleled rate of incarceration-nearly 2.23 million people, or one out of every 100 adults, are currently imprisoned in the United States. This is a distinct departure from the nation's historical experience as well as the modern experience of peer democracies. Dept. of Justice, Bureau of Justice Statistics, L. Glaze & E. Herberman, Correctional Populations in the United States, 2012, at 3 (2013), http://www.bjs.gov/content/pub/pdf/cpus12.pdf. The United States now holds the highest prison population rate in the world, over 5 to 10 times more than western European democracies. Int'l Ctr. for Prison Studies, R. Walmsley, World Prison

Population List 1-3 (10th ed.2013). Though home to only five percent of the world's population, the United States accounts for nearly twenty-five percent of its prisoners. Congressional Research Service, S. Kirchhoff, Economic Impacts of Prison Growth (2010), http://fas.org/sgp/crs/misc/R41177.pdf

As recognized by Judge Davis, along with many other jurists and experts, "[b]y all accounts, these 'tough on crime' policies have been an abject failure. A rapidly accumulating group of multidisciplinary research studies have come to the conclusion that the rate of incarceration in the United States needs to be significantly reduced, and both the executive and legislative branches seem to agree." United States v. Valdovinos , No. 13-4768760 (slip op. July 25, 2014) (Davis, J., dissenting).

This change in course has been partially brought about by the strain these policies have caused taxpayers. On average, each prisoner costs taxpayers $30,621.00 annually. Studies published by the Brookings Institute have shown that corrections expenses total $80 billion per year; and this amount soars to $260 billion once police, judicial, and legal services are included. The Hamilton Project, M. Kearney, et al., Ten Economic Facts about Crime and Incarceration in the United States (2014), http://www.brookings.edu/research/reports/2014/05/10-crime-facts.

It is not likely Mr. Rosa Sanchez will recidivate now that he has gotten a taste of the federal system and its harsh sentencing, not to mention the fact that he will be deported. Since his incarceration in this case, Mr. Rosa Sanchez has focused on staying out of trouble, and focusing on his familial relationships which matter so much to him. Indeed, Mr. Rosa Sanchez has certainly been deterred enough his arrest, and the emotional toll on his family life with the threat of all he and they stand to lose due to his incarceration and inevitable deportation. In terms of general

17

deterrence, Mr. Rosa Sanchez's plight serves as a cautionary tale to those around him, including his children, thereby deterring them from going down the wayward path Mr. Rosa Sanchez wandered.

### 4.    Mr. Rosa Sanchez Faces Harsher Conditions of Confinement than Other Offenders Due to His Immigration Status

The Ninth Circuit has acknowledged that immigration status "could lead a sentencing court to two opposite conclusions, one being that potential deportation and fewer opportunities should be a reason for a downward variance. Conversely, the other conclusion could be that a person granted the benefit of entry to the country should be subject to an upward variance for abusing the privilege. In different factual contexts, either approach is within the discretion of the court." United States v. Petrus, 588 F.3d 347, 356 (6th Cir. 2009).

At sentencing, Mr. Rosa Sanchez will ask the Court for a recommendation that he be incarcerated at FCI Ray Brook, or at FCI Otisville. The reality, however, is that as an immigrant, Mr. Rosa Sanchez can expect to be imprisoned with dangerous, violent felons despite the non-violent nature of his conviction.  It is likely that Mr. Rosa Sanchez will be placed in a facility beyond his security needs solely because of his immigration status, which will place him at unnecessary and unwarranted risk. Mr. Rosa Sanchez is a non-violent offender. A similarly-situated inmate who is a citizen of this country would normally be placed in a minimum-security camp that is relatively safe, populated with non-violent offenders. Due to Mr. Rosa Sanchez's immigration status, however, the Bureau of Prisons ("BOP") will automatically classify Mr. Rosa Sanchez as low security (or higher) and therefore not eligible for minimum-security camp status as he otherwise would have been given the [non-violent] nature of his offense". See United States v. Mohammed , 501 Fed. Appx. 431, 447 (6th Cir. 2012).

Mr. Rosa Sanchez will likely be incarcerated in a privately contracted facility specifically designed for inmates awaiting deportation. The differences between low-security facilities and camps are stark, with substantially different levels of security, overcrowding, safety, and visitation. Inmates at low-security facilities endure random pat-downs, strip searches, and lock-downs. The threat of violence is much higher at low-security facilities: many inmates have been convicted of violent offenses or are gang-affiliated, whereas the camps only hold inmates who have no history of violence.

It is submitted that holding Mr. Rosa Sanchez at one of these privately contracted BOP facilities is tantamount to multiplying the severity of his sentence. Mr. Rosa Sanchez's immigration status also affects the date on which he will actually be released from custody. Normally an inmate participates in "prerelease re-entry transitioning" at a BOP Residential Re-Entry Center (commonly known as a half-way house) near the end of his or her term of incarceration to ease the transition back into the community. Mr. Rosa Sanchez, however, will not have the opportunity to participate in this program; instead, after he has served his sentence, Mr. Rosa Sanchez will become a "detainee" in the custody of U.S. Immigration and Customs Enforcement while waiting to be deported. The process of removing Mr. Rosa Sanchez to the Netherlands could easily take several months, during which time he will remain in a county jail or Federal Detention Center.  Mr. Rosa Sanchez will likely serve his term of incarceration in close proximity to violent offenders in a dangerous and overcrowded facility, only to be detained at another facility once his formal term of incarceration is complete. The punitive effect of Mr. Rosa Sanchez's incarceration will be compounded by these factors that Mr. Rosa Sanchez will suffer only because of his immigration status. Therefore, this Court should sentence Mr. Rosa Sanchez

to the lowest possible sentence to reflect the unnecessarily heightened punitive effect of his term of incarceration as a result of his immigration status.

## CONCLUSION

This case was a wake-up call for Mr. Rosa Sanchez. Mr. Rosa Sanchez is a rare defendant in that he is one of the few to have genuinely taken responsibility for his actions and to have really learned from the mistakes which led to his arrest. Mr. Rosa Sanchez is using this experience to reassess his life, to take responsibility for his actions and to really discover what is important in life. There is a very strong probability that once Mr. Rosa Sanchez is released from prison that no court will ever have him before it again as a criminal defendant. This lesson has been burned into his very soul so much so that it is unlikely that he will waiver ever again. Even if the Court sentences Mr. Rosa Sanchez to the lowest possible sentence, Mr. Rosa Sanchez will still be serving a lengthy term in prison. Every day that he wakes up he will know that he is where he is due to the bad decisions he made and that the only way to stay out of prison is to live a law-abiding life. There is no reason to believe that Mr. Rosa Sanchez will even return to criminal conduct. Mr. Rosa Sanchez has certainly been affected by this arrest and never wants to go through this process again or to have his family suffer as a result of his actions.

Dated: August 2, 2017          Respectfully submitted

                          _____/s_____
                          Daniel DeMaria, Esq.
                          Merchant Law Group LLP
                          535 Fifth Avenue, Fl. 25
                          New York, NY 10017
                          Tel: 212-658-1455
                          Fax: 212-658-1710
                          ddemaria@nyslitigators.com

# EXHIBIT "A"















08/26/16













08-17-16



# EXHIBIT "B"

## SEARCH WARRANT LOCATIONS

### 328 Gilbert Street, Utica, NY

32.     Your affiant has learned during this investigation that 328 Gilbert Street, Utica, NY is believed to be one of the stash houses for the RIVERA/ROSA SANCHEZ DTO.   Jeffrey RIVERA is the operator of **SUBJECT TELEPHONE #3** and utilizes 328 Gilbert Street, Utica, NY. A subpoena return for National Grid indicated that Jeffrey RIVERA was the account owner for utilities for Floor 1 and Floor 2 of 328 Gilbert Street. The account was opened in August 2015 and RIVERA listed his telephone as 315-418-7824 (**SUBJECT TELEPHONE #3**).   Utility information, complied with surveillance by local, state and federal law enforcement revealed that 328 Gilbert Street, Utica, NY is believed to be a stash location for the RIVERA DTO. There are multiple surveillances where Jeffrey RIVERA only stays at 328 Gilbert Street for very short periods of time meeting with cocaine and marijuana customers. There have also been occasions where Gilbert ROSA SANCHEZ was observed by agents conducting surveillance meeting with the "runner," who works for an unidentified SOS, at 328 Gilbert Street.

33.     The following are examples of pertinent drug related calls that have been intercepted during the course of the federally authorized wiretap regarding narcotics activity associated with 328 Gilbert Street.

34.     On June 3, 2016, agents identified **GUTIERREZ's** cocaine sources of supply as **Jeffrey and Samuel RIVERA** through surveillance and intercepted communications over **SUBJECT TELEPHONE #1**. On June 3, 2016, at approximately 11:41 AM, an outgoing call (call #703 Verizon VoLTE) was intercepted between **GUTIERREZ** on **SUBJECT**

23

# EXHIBIT "C"

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | | | | Page 1 of 4 |
|---|---|---|---|---|
| 1. Program Code | 2. Cross File | Related Files | 3. File No. | 4. G-DEP Identifier |
| 5. By: Ryan M Phelan, SA<br><br>   At: SYRACUSE, NY RESIDENT<br>OFFICE (D-54) | ☐<br>☐<br>☐<br>☐<br>☐ | | 6. File Title | |
| 7. ☐ Closed ☐ Requested Action Completed<br>   ☐ Action Requested By: | | | 8. Date Prepared<br>07-05-2016 | |
| 9. Other Officers: | | | | |
| 10. Report Re: Surveillance of Jeffrey RIVERA on July 4, 2016 | | | | |

**SYNOPSIS**

On July 4, 2016, members from the DEA Syracuse Resident Office (SRO) Group D-54 and investigators from the Rome Police Department (RPD) conducted surveillance in furtherance of a Federal Title III investigation on the Jeffrey and Samuel RIVERA Drug Trafficking Organization (DTO). Reference is made to intercepted calls on SUBJECT TELEPHONE #2 and SUBJECT TELEPHONE #3.

**DETAILS**

1. At approximately 10:02 AM, SA Phelan observed a 2013 white Smart car with New York license plate GJF-1698 parked in the driveway of 1125 Miller Street, Utica, NY. At approximately the same time, SA Phelan observed the black Dodge pickup truck with New York license plate HBP-5553 parked in the driveway of 1131 Miller Street, Utica, NY. A DMV records check indicated that the Smart car was registered to Rival Auto of 647 Elizabeth Street, Utica, NY.

2. At approximately 10:09 AM, an outgoing text message (call #963) was intercepted over SUBJECT TELEPHONE #3 between Jeffrey RIVERA and telephone number 315-794-2449. The text message stated "Sorry missed your call yesterday. I'm leaving town later just incase you wanted to swing by." At approximately 10:12 AM, the operator of telephone number 315-749-2449 responded to RIVERA on SUBJECT TELEPHONE #3 via text message (call #968) that stated "Leave one out."

| 11. Distribution:<br>Division | 12. Signature (Agent)<br><br>Ryan M Phelan, SA | 13. Date<br>07-06-2016 |
|---|---|---|
| District | 14. Approved (Name and Title)<br>Christopher P Vieni, GS | 15. Date<br>7.6.16 |
| Other | | |

| DEA Form      - 6<br>(Jul. 1996) | **DEA SENSITIVE**<br>Drug Enforcement Administration | |

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.



U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION<br>*(Continuation)* | 1. File No. ▆▆▆ | 2. G-DEP Identifier ▆▆▆ |
|---|---|---|
| | 3. File Title ▆▆▆▆▆ | |
| 4.<br>Page  2  of  4 | | |
| 5. Program Code | 6. Date Prepared<br>07-05-2016 | |

3. At approximately 10:15 AM, an incoming telephone call was intercepted over SUBJECT TELEPHONE #3 (call #970) between Jeffrey RIVERA and an unknown male utilizing 315-794-2449. During that conversation, the unknown male asked when Jeffrey RIVERA was leaving. Jeffrey RIVERA stated that he was leaving in about 2 hours. The unknown male asked RIVERA if he wanted him to come down and get one now. RIVERA stated for the unknown male to give him about 20 to 25 minutes.

4. At approximately 10:24 AM, outgoing telephone conversation that was in Spanish (call #975) was intercepted on SUBJECT TELEPHONE #3 between Jeffrey RIVERA and Osvaldo GARCIA. During that conversation, GARCIA stated to RIVERA "you didn't go to the bat cave last night." Later on in the conversation RIVERA said to GARCIA "You why don't you get ready real quick, and take a ride with me, because I have something for us." RIVERA then advised GARCIA that he was on his way over to GARCIA's place.

5. At approximately 10:48 AM, SA Phelan observed the white Smart car parked at 1131 Miller Street. At that time, Jeffrey RIVERA exited the driver side door of the Smart car and walked down the driveway of 1131 Miller Street, as witnessed by SA Phelan.

6. At approximately 11:00 AM, Jeffrey RIVERA entered the Smart car that was parked at 1131 Miller Street, and proceeded to drive south on Miller Street, as witnessed by SA Phelan.

7. At approximately 11:04 AM, an outgoing telephone conversation (call # 987) was intercepted on SUBJECT TELEPHONE #3 between RIVERA and GARCIA on 917-564-9199. During that conversation, RIVERA advised GARCIA that he was at GARCIA's house. At approximately the same time, SA Phelan observed the white Smart car parked in the driveway of 1637/1639 Howard Avenue, Utica, NY. (AGENT NOTES: 1637/1639 is believed to be the residence of Osvaldo GARCIA).

8. At approximately 11:22 AM, an outgoing telephone conversation (call #990) was intercepted over SUBJECT TELEPHONE #3 between RIVERA and an unknown male operating 315-794-2449. During that conversation, RIVERA asked the unknown male where he was. The unknown male advised RIVERA that he was right around the corner from his house. RIVERA advised the unknown

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION<br>(Continuation) | 1. File No. ▮▮▮▮▮ | 2. G-DEP Identifier ▮▮▮▮▮ |
|---|---|---|
| | 3. File Title ▮▮▮▮▮▮ | |

| 4.<br>Page  3  of  4 | |
|---|---|
| 5. Program Code | 6. Date Prepared<br>07-05-2016 |

male that he would be right there. The unknown male asked "Behind the garage, there?" RIVERA replied "yes."

9. At approximately 11:33 AM, the Smart car backed out of the driveway of 1637/1639 Howard Avenue, as witnessed by SA Phelan.

10. At approximately 11:40 AM, SA Phelan observed a white male inside of a white Subaru with the trunk door open parked in the rear driveway of the 328 Gilbert Street residence, which is located on Ontario Street.

11. At approximately 11:42 AM, SA Phelan witnessed the white Smart car arrived and parked near the white Subaru in the rear driveway of the 328 Gilbert Street residence. Jeffrey RIVERA exited the Smart car vehicle and walked over to a white male and placed his hands inside of the trunk compartment of the white Subaru, as witnessed by SA Phelan.

12. At approximately 11:45 AM, the white Subaru exited the rear driveway of 328 Gilbert Street and headed north on Ontario Street, as witnessed by SA Phelan. The vehicle continued to drive west on Broad Street and was followed by SA Phelan. At that time, SA Phelan observed the license plate of the white Subaru as HGC-6150. A DMV records check indicated that the 2001 white Subaru was registered to Michael WROBEL of 15 Linwood Place, Whitesboro, NY. At approximately that time, surveillance was terminated. Later, SA Phelan obtained a license photograph of WROBEL and confirmed the white male that met with RIVERA in the rear driveway of 328 Gilbert Street was WROBEL.

### INDEXING

1. RIVERA, Jeffrey - NADDIS: ▮▮▮▮▮   REMARKS: Observed conducting a narcotic transaction on July 4, 2016.

2. GARCIA, Osvaldo - NADDIS: ▮▮▮▮▮ HM, 5'9", brown hair, brown eyes. DOB: 10-26-1990. SSN# ▮▮▮▮▮▮ FBI # ▮▮▮▮▮7. Address: 1637/1639 Howard Ave, Utica, NY. REMARKS: A criminal associate of Jeffrey and Samuel RIVERA. GARCIA was with Jeffrey RIVERA on 07-04-2016 when RIVERA conducted a narcotics transaction.

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. ███████ | 2. G-DEP Identifier ███████ |
|---|---|---|
| **REPORT OF INVESTIGATION**<br>*(Continuation)* | 3. File Title ████████████ | |
| 4.<br>Page   4   of   4 | | |
| 5. Program Code | 6. Date Prepared<br>07-05-2016 | |

3. WROBEL, Michael – NADDIS: ███████. WM, 5'4", DOB: ██-██-1957. REMARKS:
Believed to be a cocaine customer of Jeffrey RIVERA.

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.